Honorable the judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable the United States Court of Appeals for the Fourth Circuit are admonished to give their attention for the court is now sitting. God save the United States and this Honorable Court. Thank you. All right we'll call the Mr. Vinoskey and Mr. Kalambic will hear from you first. Thank you, your honors and good morning. The district court's decision below hinges on a finding that Adam Vinoskey, a business person not a valuation expert, should have automatically concluded that the price offer for shares of closely held company stock was too high. Something that every valuation professional that let's take a look at the numbers. The valuation firm involved in the transaction, Capital Advisors, found that the share price was $406 per share. Defense expert found that the share price was $493 a share. The department's own expert found it was $180 a share and the district court came out somewhere in the middle at $278.50 per share. Now the Department of Labor contends here that $406 per share is so clearly an inflated price that Mr. Vinoskey knew based on that fact alone that by accepting it he'd be violating ERISA. Did he have information about all those assessments? I thought I thought when he came into this transaction he only had Mr. Napier's numbers before seeing the $406 number. Right, he had viewed prior valuation reports and there's some disagreement at the district court level. My question is whether he had used recited all these different valuations and my question is did he have those numbers when he entered the transaction? He did not. He after four years of litigation and with the aid of a valuation expert the price the department believed that the stock was worth. Mr. Golombek, may I follow up on excuse me, Mr. Golombek, Judge Ciascia, can I follow up on Judge Niemeyer's questions? So he did not have the sort of the post transaction numbers evaluations but he did have the historical evidence of valuation which tended to show that the at least would have given someone pause as to what the what the price should have been because over the course of four or five years Mr. Napier had consistently evaluated the price of the company the shares at somewhere in the neighborhood of you know 220 to 285 dollars per share. So why shouldn't that have been and all of a sudden then we get a 400 plus valuation right before he sells his remaining portion of the shares. Why wouldn't that have been cause for some concern or at least some some further inquiry? Well the Great Recession occurred obviously during this time in 2008 and so and it affected every every company in the country and by 2009 the company which have been rising steadily as you said an increase of over 30% in the five-year period before the Great Recession like every company it it was impacted by it but there was every reason to believe it was coming out of the recession and there's evidence to believe that Mr. Winoski believed that to be the case as well as others within. I thought he said they were looking forward to a tough year tougher year. That's that's not that's not the evidence. The evidence shows that he believed that there was a backlog of orders that that was going to produce a robust future prospects for the company as well as efforts to diversify the company. The Department of Labor itself believed that the price again after 44 years of litigation the department believed that the share price was $180 a share. That's $100 less than what the district court found. So that error is the same magnitude as the amount by which the district court found the stock to be overvalued just in the opposite direction. But counsel let me let me stop you know reading through this I mean yeah I think there's some compelling arguments that your client thought the valuation was above 406. I mean he I've read all that looked at some metrics it may have been different some of his own valuations his sense from the marketplace. I think there's you know a fair argument that was his state of mind but but we're dealing with a clear error standard of review and even if I thought you had the better end of the argument how is the dollars per share range valuations not some evidence on which we have to conclude the district court was not clearly in error. Because the district courts relying upon a single data point to make that conclusion along with a finding that what supported in that is a price was justified this is according to was justified largely on by erroneous assumptions that the ESOP would gain complete control over the company after the transactions. But if you look at the calculation of damages that the district court did in its opinion that's found at Joint Appendix 2432. So he's justifying that Mr. Vanoski knew that the price was too high largely on this issue of a control right the issue of control. But if you look at the calculation of damages there's four different buckets the first three a three-year look back period discount rate long-term growth rate all technical valuation issues none of which the district court found that Mr. Vanoski had any knowledge about nor was he involved in because it was the process of the trustee working with the valuation professional. The only issue was control you know what he the district court found was accounted for by calculation of damages $600,000 in change less than 5% of the total of overpayment that the court found. So now can I follow up with you I may I may have misunderstood I thought the district courts primary evidence that Mr. Vanoski knew or should have known that 406 was above the fair market value were the previous valuations that ranged from 215 to 280 and the control issue Mr. Vanoski claimed well it should it this was now a controlling interest and so maybe that justified a higher share and the district court had some response to that. I'm not sure that was all that compelling in my mind but nevertheless that was kind of a secondary reason why a response to Mr. Vanoski's reference to controlling share and kind of going back to the clear error you said it was based on one dead data point I mean even if I give you that why is that not a valid data point I mean that's that's what clear means isn't it? Yeah but when you have the government who's litigated the case and they're saying that the price should have been $100 less than the court came up with that and that data point by itself does not justify that Mr. Vanoski knew or should have known that the price is too high particularly when the district court again the quote is the price was justified largely on by erroneous assumptions that the ESOP would gain complete control over a century after the transaction that's what the district court relied upon. What difference in the corporation functioning? Mr. Napier last assessment was I think 285 that was his assessment between the performance of the company that year and the year he assessed for 406 what changed in the company cash flow or market or anticipation I was looking for that in the record and I must say I didn't see much change it looked like the corporation was going as it had been going and Mr. Vanoski was proud of the company he was proud of his employees he wanted to keep the keep them compensated for benefits after he turned sold his stock that type of thing but I didn't see anything that showed that sharp upturn from 285 to 406 over the period of one year that justified Napier's change from the prior years and in that regard I'd just like you to take into account also that there were his appraisal at 406 had some very curious components that were pointed out to him that really didn't weren't justified at least a fact finder could include and he didn't take account of those in going to the 406 instead he came out at a number which was for the Vanoski's interest around 21 million which was exactly the number that Mr. Vanoski's attorney told the bank the transaction was worth before anybody had made that question I have is why don't they support the court's notion that somebody looking at the 406 number knew it had to be higher and I think we're conflating responsibilities here respectfully your honor because we completely agree with you that evolved as the independent trustee charged with determining whether to enter into the transaction should have looked at those components that build up the process the assumption that led to the valuation all the inputs the district court very carefully found that Mr. Vanoski did not participate in any aspects of that process all he looked at was the output which which he's testified to what he would look to and looking at evaluation was the share price what was the output well that's right that's really my point I'm accepting you at your point the question you were challenging I think the court's ruling that Mr. Vanoski would conclude that the 406 was too high and you were challenging that and you started reciting opinions by other experts but I'm suggesting that focusing on what Mr. Vanoski saw and how he acted based on the knowledge he had I was bringing in these other factual points and wondering how you respond to them one of which it looks like the corporate performance didn't show indicia to justify a jump for 285 to 406 by the very same evaluator and then that is reinforced the questioning that is reinforced by the challenges that were made to his assessment and he refused to in the discussions involving Mr. Vanoski and I I I'm wondering the real question I'm wondering is how do we say the district court couldn't have made that finding well I think you can your honor because it's not Mr. Vanoski's responsibility this is this is the fundamental principle of ERISA that you can wear a fiduciary hat for one purpose but not for all purposes and I think when we get to that that's a pretty persuasive point I think but he was also held or a participatory participating in it and that's you're more vulnerable on that one I think again I think that the issue is that did have actual or constructive knowledge and the only the data point that the court comes back to is the issue of control and again the whole point here under ERISA's regime is that you want to make the person running the plan is a fiduciary the plan and a counterparty to the plan do you want to make that person a roaming ombudsman for purposes of a transaction because if you do that then you're going to ensure that that now the selling shareholders gonna is it now is incentivized to affirmatively meddle in the process of the trustee in that process affirmatively and there's this the Department of Labor has brought that kind of lawsuit in in the Middle District of Tennessee a few years ago they brought a lawsuit against selling shareholders of the plan saying that you that you were intimately involved with the trustees valuation process and you were lobbying as to the ultimate conclusion of value you were pushing the value in a certain direction and that the selling shareholder got sued in that case so you're damned if you do damned if you do don't under under the standard that's mr. Columbia can I ask sorry I suspect that the the push from that fiduciary in that case I haven't read it was a push to increase the share price not to reduce it so that's point number one but I want to go back to the issue of control and why I mean I do think that's an important part of this calculus and you made some arguments about how that didn't seem to be an important part of the district courts opinion but I'm not so sure about that I mean I I think if in fact your client had been had an effectively and actually given up control there might have been some justification for a much higher share price than had historically been the case but the facts on the ground made it very clear that he was not giving up control and that effectively if anyone wanted to cashier him or his wife from the daily operation and management or authority over this company that they would have to fire themselves and that just seems to me quite odd and certainly ample evidence upon which a fact finder could could find that he must have known that and must have necessarily or should have as a fiduciary you know engaged in some assessment as to how that would have affected the value the actual value of the stock that he was purporting to sell to the ESOP. Judge Niemeyer, may I answer Judge Diaz's question? Of course, of course. The way to answer that question is to distinguish this case from the Brundle case in the Fourth Circuit. There they were selling shareholders who sold their shares of stock but they retained warrants as part of the selling shareholders not the ESOP got to vote the board so they got to approve the board of directors of the company. Here the ESOP in acquiring the shares of control they were now a hundred percent owner of the business and the ESOP was the legal owner and had the legal right to vote the board but ESOPs and and ERISA plans have to they actually have to operate through people, human beings and the fact is that a year or two after the transaction those human beings acting on behalf of the ESOP were Adam and his wife Carol Vlnosky nobody else and so they had to act in the best interest of the of the plan in approving and voting members to the board and if they didn't they could be sued under ERISA for not acting in the best interest of the plan. That's a distinction from Brundle where it was clear the selling shareholders got to vote the board and they had no obligation to the ESOP whatsoever. All right, thank you. Mr. Silverman we'll hear from you. May it please the court, Steven Silverman, first secretary. I'd like to first address one of the latter points of Mr. Kolumbik raised regarding selling shareholder liability in an ESOP transaction. The thrust of Mr. Vlnosky's is that it'd be unfair to hold him as a selling shareholder liable for the overpayment and a transaction in which he was the counterparty the ESOP. But Mr. Vlnosky was not just a selling shareholder. He chose to be a named fiduciary of the ESOP. With that choice came fiduciary obligations to the ESOP which as relevant here included those set forth in section 405 A3. There's no in section 405 A3 liability. Just a minute, just a minute. It seems to me you're jumping into what I think is probably your weakest point. But if I understand the record correctly, Mr. Vlnosky excluded himself from participating as a fiduciary on this transaction and hired the bank as an function. He still had the title but functionally he took himself out. And I've always understood from these cases that in that circumstance he would not be a co-fiduciary or a fiduciary. The argument, the argument, the district court found he participated because he had knowledge but it also found that he was a co-fiduciary and he challenges that and now you're suggesting that was correct. I'm interested in your views on that. Well first of all the district court made a finding that there was no formal recusal by Mr. Vlnosky. But in any event and this court discussed it in a Dawson Murdoch case. Whether or not he recused himself in the transaction, he never resigned as a trustee. There are two different types. But he didn't function in this transaction in a fiduciary. He did not hire the appraiser. He did not review the documents or conduct the review. He did not participate in the meetings and where that was all discussed. In other words he did not, they, he relied on the bank, on the advice of counsel I think, on a bank as an independent trustee. Now functionally you want him to be an actual fiduciary in this transaction without a conflict of interest and that's a hard case to make. The district court did find that but I think that's, that gets a little dicey when you're looking at it. Judge Niemeyer, I would refer to this court's decision in Dawson Murdoch. In that court, in that decision the court explains there are two types of fiduciary. There are functional fiduciary under section 321a and then there are named fiduciary under 102 and 103. And this court explained that a named fiduciary is a fiduciary and that a plaintiff does not need to plead that a named fiduciary is also functioning as a fiduciary. That would be redundant because a named fiduciary is always a fiduciary. So what that means. Mr. Silverman, I don't think Murdoch obviously didn't deal with these particular facts whereas Judge Niemeyer points out Mr. Panofsky and what you know whether or not he actually formally recused that, maybe he didn't formally enter a recusal letter but he effectively did that, didn't he, by appointing the bank to sit in his stead as a fiduciary for this particular transaction. I think because he recognized the very conflict that would otherwise ensue. I mean he's essentially he would then have to negotiate against himself so he he did it seems to make practical sense to say that at least in this context he was not acting as a fiduciary for all other purposes. Well again Judge Diaz, I would disagree that with the premise they need to be acting as a fiduciary. If you look at section 405A3, that language makes a fiduciary liable for the breach of an, if he knows of the breach of another fiduciary and fails to remedy that breach. Let me ask you this. Let me ask you this. This is hypothetical. I don't want you to assume that this is the way I take this case but what if the fiduciary had a conflict of interest and said I am recusing myself in front of the board and said I am actually going to leave town and take a vacation in Europe while you guys consummate this transaction. I don't want to be involved and he does that. They consummate the transaction and the other fiduciaries, co-fiduciaries, breach. Is he liable? No, under the facts that you described. Why isn't he liable under your argument? He's a named fiduciary. Because section 405A3, your honor, the language only, it's not vicarious liability and the department is not arguing. I'm not talking about, he is a fiduciary, he's a named fiduciary, he's one of the board members but he recused himself and left the country and denied any knowledge and didn't get any knowledge. The question is you're saying he's not liable in that at all. Why? Because one of the elements of a 405A3 claim is knowledge of the breach and if the individual left the country, as I understand your hypothetical, and completely left the scene and completely avoided all contact and actually engaged in that level of refusal, then of course that individual would not have knowledge of the breach by the other fiduciary and would not be liable under section 405A3. So the element of the, in the statutory text of section 405A3, that the fiduciary must acquire knowledge of the breach and this court and, excuse me, and this court and Dawson Murdoch did say that it relies on a departmental interpreted bulletin. Let me go back to my hypothetical. The hypothetical is he's in Europe and another fiduciary sends him a telegram and tells him what went on, which revealed enough knowledge for him to know there was a breach, but he stays in Europe because he said I recused myself and he does nothing. Is he liable? Yes, your honor. Under section 405A3, the section Even after he recused himself formally to the board from the transaction and said I am NOT going to participate in this? Well, your honor, section 405A3, you can't get away from the language of the statute. The statute says that a fiduciary is liable for the breach if he acquires knowledge of another breach and fails to take effort to remedy that breach. So the fiduciary having, again, been a fiduciary and acquired knowledge of the breach, is required under the statutory text to take action. The secretary's interpreted bulletin from 1975 that this court has said that it consistently relies on makes clear, as Mr. Vinofsky says in his brief, that yes, a fiduciary is not necessarily liable for all other aspects of a plan, but it has exceptions and the exceptions are in section 405A, the co-fiduciary liability provision. But the way to resolve your concern, says Niemeyer, is that he can resign as a trustee. There's no, he doesn't want to resign, he's just, he finds a conflict on one transaction and so he says, I want to tell you I have a potential conflict, I'm getting out of this, I'm not going to participate and I'm not going to vote, I'm not going to read the documents, I'm going to Europe. And so he does that. Now the one exception I have to try to test your argument is one of the fiduciary sends him a telegram, unsolicited, and tells him information that shows the breach. He does nothing, because he's already, he says I've taken myself out. Now you're saying that it's knowledge without function, there's no functional aspect in that analysis? Your Honor, and Garth and Modak makes that clear. The section 405A does not contain a functional or activity aspect except for remediating the breach. All right, we'll take a look at that. Okay, in the functional definition. Counsel, if I could ask just a kind of basic question of how a case like this gets started. You know, this is being brought by the department, some cases get brought by employees or participants in ESOP's plan. You know, is this, is there, are any of the ESOP participants in any way supportive or not? I don't know that ends up mattering. I'm just curious as to whether this is brought completely by the government or whether the ESOP participants have any, you know, support for it at all. I'm not aware of any support one way or another. We do have protections that we have in place for when there are complainants, you know, along the lines of informer privileges and things like that, but this time I'm not aware of, there's nothing I can tell to quote one way or another. Okay, well I want to put you in a bad spot. I'm not trying to get, you know, information that's not allowed to be disclosed. It's just, yeah, yeah, some of my questions, you know, talk about the standard review here, but it's kind of an ironic case because it, you know, there's no indication of any discomfort from the employees. They seem to be treated remarkably well. It's just an idea that this has come about, you know, maybe it's okay legally, but I just wanted to understand that. Okay, and what I can say is that oftentimes employees are not in a position to know sufficient information that they would raise a concern. For example, they would not necessarily have access to the evaluation report. They would not have access to the processes and procedures of the fiduciary. So a participant in a plan would only have limited information, and that's not to say that there isn't private litigation regarding USAP, but in any event that doesn't affect the department's own investigation. Mr. Soberman, can I follow up on this, and I don't want to beat a dead horse here, but it's interesting to me. I want to know why the department is so, you know, hung up on affirming all aspects of the district court's decision, in particular the co-fiduciary portion of the decision, which I think is problematic for the district court. I think it's a little bit exormized by virtue of the questions we've asked, because there's an alternative theory here, right, that more than amply encompasses the very liability that the district court found, and that is that notwithstanding whether or not he was a co-fiduciary for purposes of the transaction, that he still has, there's still the issue of knowledge and the, you know, the question of liability and that aspect of ERISA. So why is it a concern that you want to hang on so strongly to this co-fiduciary prong of liability in this particular context? Well, if I understand your question, Judge Diaz, the fiduciary provisions of ERISA are the preeminent provisions of ERISA and that protect the employees and the participants. So if I understand you referring to the not knowing participation claim under ERISA, there are, you know, an individual who is liable as a non-fiduciary knowing participant, which is an alternative finding by the district court, is obviously another critical component of ERISA, but the district court, excuse me, but the department, you know, in looking at protecting participants, certainly primarily will focus on a fiduciary claim because the fiduciary has an obligation to the participant to act in the best interest of the participant, whereas someone who is not a fiduciary, for example, if Mr. Vinovsky had not chosen to be a fiduciary for purposes of a transaction in this case, then that would be a different type of a case where he doesn't have four or five liabilities, for example. So I think it's maybe it's just a bit of belt and suspenders on the government's part, but the department, the most preeminent theory of imposing liability and protecting participants is to proceed through the fiduciary, excuse me, holding individuals liable as fiduciary. Okay, so let me let's move on because I want to get to the sort of the principal theory of liability here, and you heard your colleague on the other side saying that there's no way that Mr. Vinovsky could or should have known about the reasonableness of this transaction because of the widely varying estimates of value that attach to this stock from different experts, you know, across the board, some too high, some too low, and the like. So I'd like you to respond to that. Well, for starters, I think Judge Quattlebaum and Judge Niemeyer had it correct with the finding that Mr. Vinovsky knew the price was too high to subject to clear error review, and that finding that he was, that he knew that the price was too high is supported by the evidence. So Mr. Vinovsky, he's not just a layperson on the street, he's the founder, the CEO, the president, the chairman of the board of Century. He ran this company. He, it's not surprising, therefore, that after he sold half of his stock in 2004 for nine million dollars, he reviewed the annual appraisals and topped out at $285 per share in 2009. And then in 2010, when he wanted to sell the rest of his stock, the share value jumped by 40% to $406 per share, even as the company struggled. And anybody would know, and I think Mr. Vinovsky in particular did know, given his knowledge of the company, that that price was way too high. He controlled the company, he ran the company, and he was the company. I think, as Judge Niemeyer referenced, there was no business reason to justify such a increase in the price. That increase would be significant for any company. And what is problematic here is that, as Mr. Vinovsky indicated in his reply brief, Century ended up outperforming expectations in 2010. But as Niemeyer testified, expectations in 2010 were so low that even when the company exceeded expectations, it underperformed the poor performing years of 2008 and 2009, all of which Mr. Vinovsky knew. If anything, this stock could have been worth less in 2010 than in 2009. And the decision below... Well, but let me jump in a little bit. I mean, you don't have to convince us, I don't think. I mean, your arguments, I understand those arguments, and they prevailed. And to me, there's significant evidence the other way. The point is what we do in our role, and all we have to show is the only thing that is our standard is clear error. And so, yeah, I mean, just from my perspective, it seems like we don't need to go with your theory, hook, line, and sinker. We just need to have evidence that there's some evidence that supports the verdict or the decision. And that, you know, so anyway, I just caution you. I mean, there's compelling evidence both ways here. I got one question I'd like to deal with on a separate topic. The district court said that the Brundle decision bound him to deny the offset of the debt reduction that came after this transaction. I've read Brundle carefully several times, and it seems like a very different case than this. I don't, I don't, you know, is it your position that Brundle, you know, compels that resolve? Yes, Your Honor. While the Brundle, of course, dealt with a subsequent stock sale rather than debt forgiveness, but the principle remains the same. And the principle is derived from the fact that if the ESOP somehow comes into money in the future that is unrelated to curing the ESOP, excuse me, curing the overpayment or remedying the overpayment, then that unrelated money or fund cannot be used to offset the overpayment. So while the Henry case and other cases have rejected the, every court has rejected the offset of a unrelated debt forgiveness, the Brundle case simply took that principle that unrelated money that the ESOP may receive cannot be used to remedy and applied it to the subsequent stock sale that occurred. The principle remains the same. Well, maybe it does, but you know, I don't know that it does. Let me just say, I mean, Brundle, as you note, involved, you know, an appreciation from a third party purchase and the debt reduction that, you know, and that was mainly, that was the vast majority of the opinion on the offset. You know, there was discussion of the debt reduction that occurred as part of that transaction. But it seemed to me the reason this court found that was unrelated is that debt reduction was solely to make that third party transaction go through. And here we're dealing with the original participants. And, you know, if you're right, you know, that the amount of damages is, you know, the delta between the fair market value and 406 plus, in effect, an additional four point something million. I just I don't see how you can really credibly say you've lost six million when 4.6 or whatever has been forgiven. Well, what I would say, Your Honor, first of all, is that the debt forgiveness in Brundle was for the purpose of getting that third party transaction put through. The debt forgiveness in this case was for the purpose of helping out, essentially throwing a downturn in the bottling industry, not to help the ESOP. And as we explained in our brief, that's common sense. If we gave the hypothetical that if someone sold a fake painting to somebody for $10,000 and then four years later attended the buyer's wedding and gave them $500, they couldn't later in a civil fraud suit claim that they can offset the $500 for the wedding present from the wedding present against the civil fraud. So that's not that I agree with you on that. But I mean, that's that seems like it's changing the facts. I mean, they reduce the debt that was owed for the purchase price. That I mean, if if someone had to use your hypothetical, if the seller or the purchaser of the painting sued them for overcharging them for the painting, but in between that time, there had been a reduction in the purchase price, they wouldn't get the original purchase price, they have to look at what the reduction was. What I will say, if I can just respond to that, Your Honor, over my time is that there are ESOP transactions that occur with a transaction document include in them and a future potential offset if the company happens to miss earnings. So they contemplate at the time of the transaction that a debt reduction will occur in the future, if the company again, misses earnings and so, you know, underperforms expectations. And in that case, the department would agree, because that's for the purpose of curing the overpayment, that a debt reduction, or debt forgiveness would be appropriate as an offset. But those are not the facts here. The facts that Mr. Mr. Vinaski, excuse me, forgave the debt to spare the company a downturn in the bottom industry has nothing to do with curing the overpayment. I'm sorry, can I follow up on Judge Qualabong's question about this issue? So there's Brewster, and then there's this other case called Henry, where the court purported to offer a rationale for why, you know, an offset would not be appropriate. And as I understand it, the concern is that because the additional consequences, economic consequences and damage as a result of that debt, even before the borrower begins to repay it, that seems like a damage argument. I mean, if that's the theory, I know you have a theory about whether or not it's related or not. But if the theory is you want to make the ESOP whole, why shouldn't that be a part of the damage calculation on the front end? And why should that at all affect the ability of Mr. Vinaski in this case to obtain an offset for, you know, for a reduction in the very debt that he assumed that, you know, based on the original stock transaction? Well, if I'm understanding your question, Judge Sears, I think it goes to what was the purpose of the debt forgiveness. And under Henry, it's the purpose if Mr. Vinaski had said, I'm going to forgive $4.6 million in debt in order to cure the overpayment that occurred in 2010, then we agree that would be a proper offset. That is not what occurs here. He forgave the debt to spare the company a downturn in the industry. And that is not pure, as you mentioned, the overpayment that occurred the day of the transaction is unrelated and therefore isn't a basis for an offset under Henry and Brewster. But the damages were calculated not on that first transaction, was it? It didn't come into play. It was the second transaction where the debt on which the damages were calculated. Is that right? Correct. The 2010 transaction. I don't know if I missed both. And that involved what? Half the stock of the company or roughly half? Yes. And so the forgiveness related to the first transaction. When he sold of the first portion of the stock. Isn't that right? The ESOP incurred an indebtedness with respect to the purchase of the first chunk of stock, right? By the time the 2010 transaction occurred, the ESOP had essentially paid off in the entirety of the purchase. I understand, but I'm just trying to, and these are maybe a little bit softballed, because I understood that the forgiveness of the debt did not relate to this transaction in any way. It related to an earlier transaction, which had pre-existed and was unrelated to the final buyout. Am I assuming that correctly? Are we talking about the forgiveness? Yes, he forgave a debt. What was the debt incurred for? The debt that was incurred was related to the second transaction. According to the district court, the first transaction, the debt had been paid off by the time of the transaction. So regardless of, does that answer your question? So you're arguing basically, this is like a collateral source rule. In other words, that the payoff was not related to overpayment, but was related to an industry condition. That's correct, your honor. All right. I'd like to ask you one unrelated question before you sit down. I know we've got you over time here. There was an email in the record where Mr. Gust, the attorney for the company, was soliciting the bank to become a trustee and referred to the transaction as a $21 million transaction. It turned out later that Napier came in with his appraisal at $21 million. My question is, where did Gust get that number? Does the record show? According to the email itself, it says that Mr. Napier has advised that the transaction will go forward at $21 million. The Gust said that before Napier did his appraisal? Correct. Does the record show where Napier got that number? No, your honor. All right. Thank you. I believe Mr. Napier denied providing that number, but I'm not sure about that. The reason I'm asking is the question, you try to put together the puzzle in this and you try to find out the degree to which Mr. Banowski knew what was going on or participated. There could be an implication or an inference that he had discussed selling out his share with his attorney and with Napier and said, how we go about this? An attorney says you need to get an independent trustee to avoid a conflict. And so then the attorney sends a letter to the bank saying this is a $21 million transaction, which suggests that before Gust wrote that email, it had some kind of discussions, in-house discussions as to explaining how this goes forward. And it would be, which might be imputable to Mr. Banowski, but you're saying that source of that number is not clear. The, well, no, what I'm saying is that email, and I can read it, it quotes, Mr. Gust stated, quote, the value of the remaining stock as determined by Brian Napier is approximately $21 million. That's what the email said. And Napier had not, he'd not done any appraisal at that point, had he? No. And that, Your Honor, that goes to some of the deference that we report to the trial court, because I know that Mr. Banowski would say that there's only a single data point to justify the district correspondence. But there's a lot going on here, including that email traffic, including the rush to complete the transaction, the tax purposes, the lack of any negotiation with Mr. Banowski. There's a lot going on that the trial court heard the witness testimony and was able to render that decision that he knew the price was too high. But Mr., let me just make sure that I mean, there's a lot going on and those all relate to evolve. And the district court, the things you're talking about now, the district court specifically said he not only didn't know, but he should not have known about. So this really comes down to the knowledge of the 215 to 285 shares before and whether the 40 percent increase would have been enough. And that's based on the district court's finding really yet. Now, that may be enough under a clear air standard review. But all that others, all that other stuff that's going on, you know, tied to evolve in the district court found that Banowski didn't know about it. Respectfully, Judge Quattlebaum, Mr. Banowski would have known that there was no negotiation on the part of Banowski. Excuse me, because he would be the counterparty that that didn't occur. There is a finding by the district court that Mr. Banowski was aware that the transaction was being pushed through for tax purposes, in order to benefit the, excuse me, for tax reasons. And I'll leave it at that. And with respect to the email traffic, you're correct. There's no finding that Mr. Banowski was on the email traffic. But as Judge Niemeyer indicated, when Senator's lawyer sends an email, when Michael Coffey sends an email, who's someone hired by Mr. Banowski to work on the ESOP deal, when people send these emails that are basically signaling the $21 million price before the opposer has done anything, these are the, these are the inferences that might be drawn by the district court about what was really going on here. I guess Judge Quattlebaum's point, though, is the district court didn't rely on those findings. He didn't, didn't make, didn't reach inferences from that. Is that correct? I think that's correct, yeah. Okay, thank you. All right, why don't we hear from Mr. Kolumbic again. You have something to bottle. Thank you, your honors. To the point of the knowing participation claim, the legal standard, and I understand it is a clear error standard, but the standard is, was the knowledge, was it obvious to the person? And, again, the point for providing those different… So, I hate to interrupt you right off the bat, but that's an important point, and it's the first we've talked about it. I mean, I spent some time on that, and it looked like the obvious standard, you know, I realize that your argument, how you got there, but the cases that talk about that are Eighth Amendment cruel and unusual punishment cases. I just, I don't see how there's really support that this has to be obvious. Now, you know, there was the debate about whether you just need to know the facts or know whether there's a breach, and I'm convinced you need to know whether there's a breach, but the obvious standard, that just seems like a remarkable stretch when all the law that really talks about that is Eighth Amendment cruel and unusual punishment. Yeah. If you go to the Intel decision, which is the most recent ERISA decision to quote the FARMER case, they quote it, and they say that FARMER stands for the proposition that they use the, quote, usual ways to infer actual knowledge, and those usual ways, they cite to the FARMER case specifically, because I understand that it's a progeny of Eighth Circuit cases, but I believe that the Intel decision affirms that the legal test is obviousness. And if you look at those four different valuation data points, they're all over the spectrum. And respectfully, we- Why do you say that? They consistently started at 215 and went up from year to year to 285. That was perfectly, and he also had a transaction at that level. That, to me, those three or four data points are all pretty consistent with each other, I think. Respectfully, Your Honor, I'm talking about the valuation experts, the Department of Labor's expert who came in at $180 a share. I understand, but when we're looking at evidence, we've got to look at evidence that was seen and known by Mr. Vonoski. And to that point, you had a company that was growing consistently before the Great Recession. It hit the brakes like every other company did. But when you're evaluating a company, as you were doing in 2010, at the end of 2010, going into 2011, you're looking at what are the forward-looking prospects for the company. And this company looked like it was a company on the rise, heading out of the Great Recession. So, again, we respectfully submit there may be evidence on both sides, but that does not pass the obvious test. With respect to the offset, again, Brundle looked at both Henry decisions. In the first Henry appeal decision, they looked at the question, the Second Circuit sent back to the district court in that case, which is, in that case, like this one, where you had selling shareholders voluntarily agreeing to give up ESOP debt, does that impact the district court's calculation of damages? And the Second Circuit said, you should look at that to make sure that you avoid a windfall to the plan. And a great way of looking at this is let's just assume instead of Mr. Vonoski forgiving a partial part of the ESOP debt, which goes back to the $21 million transaction, he forgives all the debt, all the debt. In that case, you now have an ESOP that owns 100% of the shares of stock. It didn't spend any money because there was no loan repayment obligation to do it. And it's getting $6.5 million in damages as part of an award. That's a windfall. That principle is no different here when you have a partial loan forgiveness, which is what happened with Mr. Vonoski. Unless the court has any further questions, I don't think I have anything else to address on rebuttal. Thank you, Mr. Columbic. We appreciate the argument of both counsel. And as you both may know, our custom and practice is to come into the well of a court and shake your hands. And this Zoom business has not allowed us to do that yet, as far as I know. But I do want to extend our greetings as if we were in the well of a court shaking hands.  Thank you, Your Honor.
judges: Paul V. Niemeyer, Albert Diaz, A. Marvin Quattlebaum Jr.